Edward Neal **ALFORD,**
**Plaintiff–Appellant,**

v.

**APPALACHIAN POWER COMPANY,**
**Defendant–Appellee.**

**No. 91–3017.**

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 30, 1991.
Decided Dec. 5, 1991.

Joseph Abraham Sanzone, Paul White-head Associates, argued, Lynchburg, Va., for plaintiff-appellant.

James Wilson Jennings, Jr., Woods, Rogers & Hazlegrove, Roanoke, Va., argued (H. Allen Glover, Jr., Kevin S. Blair, Woods, Rogers & Hazlegrove, Roanoke, Va., on the brief), for defendant-appellee.

Before RUSSELL and NIEMEYER, Circuit Judges, and HERLONG, District Judge for the District of South Carolina, sitting by designation.

## OPINION

NIEMEYER, Circuit Judge:

In *Price v. Price*, 929 F.2d 131 (4th Cir. 1991), we held that a tort claim arising out of alleged errors in navigation on the John H. Kerr reservoir, which straddles the North Carolina–Virginia border, came within the admiralty jurisdiction of the federal courts. We must decide here whether a tort claim arising from an accident on Smith Mountain Lake, another of the lakes on the Roanoke River, located entirely within Virginia, is likewise within the admiralty jurisdiction of the federal courts under 28 U.S.C. § 1333 (1988). At issue is the larger question of when boating accidents on the many lakes in our country give rise to claims in admiralty. Whether a claim may be brought under admiralty jurisdiction has significant consequences not only in connection with the trend begun by *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), to federalize boating tort claims, but also with respect to the law to be applied in disposing of those claims. For instance, in this case if Virginia civil law were to apply, contributory negligence might provide a defense, *see, e.g., Smith v. Virginia Elec. & Power Co.*, 204 Va. 128, 129 S.E.2d 655 (1963), and any punitive damage award might be subject to a statutory cap, Va. Code Ann. § 8.01-38.1 (Michie Supp.1991), neither of which is the case under admiralty law.

In July 1988, while Edward Neal Alford was motoring his sailboat near Halesford Bridge on Smith Mountain Lake, Virginia, the mast struck an overhead power line maintained by Appalachian Power Compa-

ny. An electric charge passed through the boat killing one passenger and injuring Alford and several other passengers. The fingers on Alford's right hand were burned off and he sustained disfiguring injuries to other parts of his body. It is alleged that as long as eight years earlier Appalachian Power had been warned about the risk that this power line posed to sailboaters and that it had also received subsequent warnings, including one from a state senator.

The state claims of the passengers against Appalachian Power have been settled and, with respect to those claims, Appalachian Power is seeking contribution from Alford in state court, alleging his contributory negligence in navigating the sailboat. Alford, too, has a state claim pending against Appalachian Power.

Alford sued Appalachian Power in federal court invoking admiralty jurisdiction. The district court granted Appalachian Power's motion to dismiss on jurisdictional grounds, including the basis that "Smith Mountain Lake is a dammed, lockless lake located wholly within one state and as such cannot possibly form a continuous highway of commerce with other states or foreign countries as required to invoke admiralty jurisdiction." Alford has limited his appeal to the question of whether he properly invoked admiralty jurisdiction. Because we conclude that the accident did not occur on navigable waters, we affirm.

■■■■ Admiralty jurisdiction is afforded for the resolution of maritime tort claims arising from traditional maritime activity on navigable waters so that uniform rules of conduct can be developed and applied to commercial shipping. *See Price*, 929 F.2d at 133 ("Admiralty jurisdiction over maritime torts depends on the *locus* of the tort on navigable waters and its *nexus* with traditional maritime activity."). Even if the tort does not involve a commercial vessel, the demands of uniformity and certainty require that commercial and pleasure vessels be governed by the same rules. *See Foremost*, 457 U.S. at 675, 102 S.Ct. at 2658 ("potential effect of noncommercial maritime activity on maritime commerce" cannot be ignored). Admiralty's interest in

providing uniform and predictable rules for conduct on waterways of commercial travel extends only to waterways capable of use for transportation between the states or with foreign nations. A body of water that is confined within a state and does not form part of an interstate waterway is not an admiralty concern. *See The Roberts W. Parsons*, 191 U.S. 17, 26, 24 S.Ct. 8, 10, 48 L.Ed. 73 (1903) (defining navigable waters as those which " 'form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries, in the customary modes in which such commerce is conducted by water' " (quoting from *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870))). Admiralty also extends only to waterways that can bear commercial shipping. While it is not necessary that the waterway be in current use for such shipping, it must in its current configuration be so capable. Rules of admiralty cannot remain uniform or have any certainty "if their applicability is dependent on whether, on any given day, commercial maritime activity is being conducted on the waters." *Price*, 929 F.2d at 134. We thus define navigable water for purposes of admiralty jurisdiction as a body of water which, in its present configuration, constitutes a highway of commerce, alone or together with another body of water, between the states or with foreign countries over which commerce in its current mode is capable of being conducted.

Alford argues that because the Roanoke River was "once found to be navigable, [it] remains so," citing *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 408, 61 S.Ct. 291, 299, 85 L.Ed. 243 (1940). He presented evidence that during the 1800's the Roanoke River was navigable from the Albemarle Sound all the way to the town of Salem, Virginia. The States of Virginia and North Carolina had caused the river to be cleared of obstructions and constructed sluice gates and stone walls to facilitate the towing and passage of long wooden boats known as bateaux. These bateaux routinely transported cargo the entire distance from Albemarle Sound to Salem, at

least until the advent of railroads. In 1964, Smith Mountain Dam was constructed on the Roanoke River as part of a federal hydro-electric power project undertaken by authority given to the Army Corps of Engineers over navigable waters. The impounded waters of the river created Smith Mountain Lake. *See State Water Control Bd. v. Hoffmann,* 574 F.2d 191, 192–93 (4th Cir.1978) (finding Smith Mountain Lake a navigable body of water for purposes of Corps of Engineers authority). Although Alford recognizes that at the present time the lake lies wholly within the State of Virginia and has no locks to facilitate movement past the dam, he argues that the river, once being navigable, confers jurisdiction on the federal government over the lake and that the removal of the dam could once again return the river to a navigable waterway between the states.

The rule upon which Alford relies, that "when once found to be navigable, a waterway remains so," *Appalachian Elec. Power,* 311 U.S. at 408, 61 S.Ct. at 299, applies to cases concerning Congress's commerce power and is relied upon "to preserve [the river] for purposes of future transportation." *Economy Light & Power Co. v. United States,* 256 U.S. 113, 123, 41 S.Ct. 409, 413, 65 L.Ed. 847 (1921). Admiralty, though, is not concerned with the maintenance of rivers or other bodies of water, but rather with the conduct of those who use them, and it does not extend to the limits of federal power over waters of the United States. Other federal interests may and do justify federal jurisdiction over waters which are defined as navigable for other purposes. *See Kaiser Aetna v. United States,* 444 U.S. 164, 171–72 & n. 7, 100 S.Ct. 383, 388 & n. 7, 62 L.Ed.2d 332 (1979) (distinguishing four separate purposes underlying different definitions of "navigable waters"). It is irrelevant to the interest of admiralty in unifying rules of navigation on the waterways that at one time, when a waterway was in a different configuration, it was navigable. It is therefore not surprising that the cases hold uniformly that a historical commercial use of a body of water in a configuration predating the creation of the current configuration does not

support admiralty jurisdiction. *See Three Buoys Houseboat Vacations U.S.A. Ltd. v. Morts,* 921 F.2d 775, 779 (8th Cir.1990) (finding no admiralty jurisdiction over a dammed, lockless lake wholly within one state), *cert. denied,* —— U.S. ——, 112 S.Ct. 272, 116 L.Ed.2d 224 (1991); *Adams v. Montana Power Co.,* 528 F.2d 437, 439 (9th Cir.1975); *Chapman v. United States,* 575 F.2d 147, 149 (7th Cir.1977) (en banc), *cert. denied,* 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978).

The decisions in *Price* and *Finneseth v. Carter,* 712 F.2d 1041 (6th Cir.1983), which concluded that dammed lakes were nevertheless navigable bodies of water for purposes of admiralty jurisdiction, based their decisions not on the historical configuration of the body of water but on the fact that the lake in each provided a waterway between two states which was capable of commercial shipping.

Smith Mountain Lake is a dammed, lockless lake lying wholly within the State of Virginia. As a body of water by itself, it cannot act as a highway of commerce between two states or with foreign countries. Nor can it, because of its present configuration, become a part of such a highway by uniting with other waterways between the states or with foreign countries. Should the dam ever be taken down or destroyed and the Roanoke River once again be restored as a navigable waterway between the states, then claims arising from accidents on the river at that time may once again be subject to admiralty jurisdiction.

Alford argues that admiralty jurisdiction should apply because Smith Mountain Lake presently supports commercial interests which affect interstate commerce. He presented evidence to the district court that existing businesses use the lake for dinner and sightseeing cruises and to promote, sell and maintain boats for recreational use on the lake. Although the activity described by Alford might amount to commercial activity, which even may affect interstate commerce, the lake does not thereby become a waterway for commerce between the states. At most it provides a waterway for passengers to travel from

one side to the other, but all within a single state. While this might, under appropriate circumstances, justify an exercise of the commerce power over Smith Mountain Lake, it does not amount to the commercial shipping between states or with foreign countries that enables the application of admiralty jurisdiction.

We hold that Smith Mountain Lake is not a body of water that is navigable for purposes of admiralty jurisdiction and therefore affirm the district court's order dismissing this case.

AFFIRMED.